Clerk of The U.S. District Court:
Delaware

**ORIGINAL**

12 March 06

Dear Clerk:                    Re: 06-11-SLR

Please find original and seven (7) copies of Amended Complaint as per District Court order filed 27 February 06.

Truly,

*[signature]*

Leonard Baylis 100231
DE Correctional Center
Smyrna DE 19977

FILED
MAR 16 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

# ORIGINAL

(Rev. 5/05)

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. §1983

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
MAR 16 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

(1) __Leonard K Baylis / 00231__
(Name of Plaintiff)      (Inmate Number)

__Delaware Correctional Center__
__Smyrna, Delaware 19977__
(Complete Address with zip code)

(2) _____
(Name of Plaintiff)      (Inmate Number)

_____
(Complete Address with zip code)

(Each named party must be listed, and all names
must be printed or typed. Use additional sheets if needed)

: Amended Complaint
: 06-11-SLR
: (Case Number)
: (to be assigned by U.S. District Court)

vs.

(1) __Mr. Stan Taylor et al__
(2) __Chris Milaney et al__
(3) __Jane Doe # et al cont.__
(Names of Defendants)

(Each named party must be listed, and all names
must be printed or typed. Use additional sheets if needed)

: **CIVIL COMPLAINT**
:
: • • Jury Trial Requested

## I. PREVIOUS LAWSUITS

A. If you have filed any other lawsuits in federal court while a prisoner, please list the caption and case number including year, as well as the name of the judicial officer to whom it was assigned:

__NONE__

Additional Defendants

#4 Bruce Doe #

Last Name yet unknown.

Many Medical Workers will not give their Full Name.

#5 Dr. Anthony Cannoli

II. **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

In order to proceed in federal court, you must fully exhaust any available administrative remedies as to each ground on which you request action.

- A. Is there a prisoner grievance procedure available at your present institution? ✓ Yes  • • No

- B. Have you fully exhausted your available administrative remedies regarding each of your present claims? ✓ Yes  • • No

- C. If your answer to "B" is Yes:

    1. What steps did you take? Grievances, Letters verbal Complaints

    2. What was the result? No Actual Response or Solution within Reasonable time

- D. If your answer to "B" is No, explain why not: N/A   N/A

III. **DEFENDANTS** (in order listed on the caption)

(1) Name of first defendant: Mr. Stan Taylor et al
Employed as Commissioner at Dept of Corrections
Mailing address with zip code: 245 McKee Drive
Dover Delaware 19901

(2) Name of second defendant: Chris Milaney et al
Employed as Supervisor at Correctional Medical Systems
Mailing address with zip code: 1181 Paddock Road
Smyrna Delaware 19977

(3) Name of third defendant: Jane Doe
Employed as Dental Nurse/Supervisor at Correctional Medical Systems
Mailing address with zip code: 1181 Paddock Road
Smyrna Delaware 19977   cont.

(List any additional defendants, their employment, and addresses with zip codes, on extra sheets if necessary)

2

Additional Defendants

#4 — Bruce Doe: (unknown last name)

Psychologist or Nurse At
Correctional Medical Systems
1181 Paddock Road
Smyrna, Delaware 19977

#5) Dr. Anthony Cannoli
Psychiatrist: Correctional
Medical Systems:
1181 Paddock Road
Smyrna Delaware 19977

## Statement of Claim

On 23 Nov. 05, Dr Alexander Jacobson at the Delaware Correctional Center, Smyrna, continued me on medications I had been administered both in the community and at Gander Hill Prison, Wilmington. These medications: Prozac, Ritalin and Dilantin — along with therapy — had been working together, with limited problems, helping me to think and act normally — unless I stopped taking medication.

On 11 Jan 06, a replacement doctor, Dr Anthony Cannuli, rescinded the Ritalin, stating that Correctional Medical Systems does not recognize the mental disorder ADD, even though, for me it is a debilitating neurological disorder and is recognized as such by the Surgeon General of the United States, the medical and psychiatric profession and the Federal government.

Dr. Cannuli did not prescribe any alternative medication, nor did he spend any time on the issue to evaluate, give tests, ect. to measure or grasp — as previous doctors have — the extent of my illness. This illness, without being treated, is causing a significant

II

change in my thinking and behavior to where I increasingly experience episodes of confusion, anxiety, frustration and anger. Sometimes I "get lost." Sometimes I cannot control my actions and I, pose a possible danger to myself and others. I have told repeatedly I, will be considered for housing, in one of the special needs units where the environment will be more compatable with my mental disorder, instead of exacerbating it.

Psychologist Bruce (Doe)           , De Correctional Center, has repeatedly advised that he will have me considered for a special needs unit and having me re-visit the psychiatrist for 2nd line medication and therapy for ADD. Each date that Bruce has promised for these things to take place has come and gone, without any action at all; and, so far, my "Therapy" has consisted of Bruce advising me to "drink alot of coffee". There is no actual therapy — only paperwork and words.

I assert this neglect, combined and or individually, constitutes deliberate indifference, to my mental health — to the point of 8th Ammendment violations. And I make this claim against

Dr. Anthony Cannuli for his neglect and indifference; for his not prescribing either 1st line or 2nd line (alternative) medication for my ADD disorder. And for his rescinding my regular ADD medication. And I make the claim of 8th Ammendment violations against Psychologist Bruce (Doe) for his deliberate indifference to my mental illness by not following through, with action, his words; And, by this, my not receiving proper mental health treatment.

I also make the claim of 8th Ammendment violations against Stan Taylor, Commissioner of Corrections, State of Delaware and Chris Milaney, Correctional Medical Systems, Delaware Correctional Center for allowing to be in operation or causing to be in operation, or actually operating a medical department that is understaffed, unorganized and unprepared to meet the needs of the prison population — This to where individuals mental health and other treatment is cursory at best and, in my case, negligent.

The amount, in numbers, of mental health,

IV.

Medical And Dental personnel Fall Far below the Number Required per CAPITA of prison inmates As outlined in Tillery V Owens: *1291; (For Number Of inmates Addressed) And #1303 - Attached (For Number of Mental Health persons Needed).; What the expected Number of medical personell in A prison population of 1800 (As in Tillery) is, is not met here At The Delaware Correctional Center whose population is between 2500 And 2600. This being so, the mental health unit is overburdened to the point where I Am being denied Adequate Mental Health treatment. Present Mental Health treatment is Superficial, And As A Result My Mental health condition is Worsening.

I Also claim that the medical grievance process is untimely And haphazard; that there is No timely or efficient Vehicle For Communicating And Receiving A Response vis à vis emergency Mental health Needs. Also there is A lack of staff to Recognize An emergency Mental health Situation unless one First Receives A Write up, one is harmed or one harms Another. The Mental Health Dept is quick to Respond Negatively

V

to an individuals unusual or frustrated behavior, rather than reacting in a professional manner and considering possibilities for treating this behavior before it reaches serious levels. This being so has caused 8th Ammendment violations to me, causing me harm, with treatment being reactive hasty and superficial, rather than accurate

Also movant has been requesting dental work since March 05. On 29 November 05, while dentist was preparing to do dental work on movant, Dental Nurse/Supervisor (Jane Doe) refused to let work go forward, saying, "you might have to wait another year for dental work." I have no teeth (lost them while in Fugue) and cannot chew correctly — this is causing stomach problems. For this I claim 8th Ammendment violations against all the persons above, for all the reasons above and also against Nurse/Supervisor (Jane Doe)

Movant prays the Court, to allow him to present evidence of his history of ADD (from youth) Depression and Fugue — how

VI

This has affected his behavior, his life, his legal status and how, left untreated, can cause serious complications both now and in the future. One of the challenges Movant confronts is the fact that I can use my intelligence to write this complaint and one might say, "if he can do this there must not be anything wrong with him." What may not be known is that I have help with this from various sources. Further, I have before me about 50 pieces of scrap paper where thoughts came in no functional order, until over a weeks period I am, with help, able to put together what has become puzzle pieces of thoughts and words, sometimes becoming so frustrated I must stop, lay back, stare at the ceiling, my mind swirling. Scared.

Under proper treatment I can do much better. And I claim 8th Ammendment violations against all the aforementioned parties for not even trying to listen to the pleas from this mostly silent but suffering individual.

## VII. Relief

I ask for treatment for all of my mental problems, including ADD — if not by first line medication and therapy, then by 2nd line medication and therapy. I ask to be housed in an area where professional mental health therapy is available on a regular basis — where I am protected from an environment where psychological deterioration is probable and self improvement unlikely. If the Department of Corrections does not have the proper staff and facilities to offer real and actual treatment, to be transferred to a facility where professional treatment is available.

I ask that it actually be pondered how, without full treatment, my condition will be worsened; how by way of accurate and honest treatment of my illness, my condition can be improved — at least to some degree, where I can gain and hold more consistently a balanced comprehension of the activities going on around me; where I might regain my art and reading ability; and where I will be placed on a better footing — not made worse — when I must confront the challenges and changes of the real world when released.

I ask that declaratory and or injunctive

VIII

Relief be at the discretion of Justice. I adamantly appeal to the court that an emergency injunction be applied to stem the needless suffering from inadequate mental health treatment; that is, that the court compel Correctional Medical Systems and or Department of Corrections to schedule, as soon as possible, a visit with the psychiatrist for the reason of considering an effective alternitive medication (and actual therapy) for the one which was rescinded (for ADD). Failing to do so is causing needless suffering and possible future damage.

If Correctional Medical Systems or the Department of Corrections is not willing or not prepared to do this, or not willing or prepared to recognize what most medical and scientific based organizations in the world recognize — that ADD is a real and identifiable disorder with potentially devastating consequences if not treated — that I had been diagnosed and treated for ADD in the community and at Gander Hill prison — that my seizure disorder is fugue type and that reasonable dosage of ADD medication does no pose a

danger.... I Ask that it be ordered to have an outside psychiatrist — An unbiased entity — evaluate me

I Ask for Actual Dental Treatment — Dentures.

I Request the Cost of Filing this complaint and other Related Fees be paid by Defendants.

I Ask it to be Considered that an Attorney be ordered to Represent me to help me communicate these issues in correct legal terms and to help obtain Records and other materials that may be critical to this case.

Respectfully Submitted  12 March 06

Leonard Baylis

Leonard Baylis 100231
Delaware Correctional Center
Smyrna Delaware 19977

# This Case: Tillery v Owens is Forwarded to clarify Numbers only

2. _See Attached_

3. _See Attached_

I declare under penalty of perjury that the foregoing is true and correct.

Signed this __12th__ day of __MARCH__, 2__006__.

_Leonard K Bayli_
(Signature of Plaintiff 1)

_____
(Signature of Plaintiff 2)

_____
(Signature of Plaintiff 3)

**National Resource Center on AD|HD**
A Program of CHADD

8181 Professional Place
Suite 150
Landover, MD 20785

Tel: 301.306.7070
Fax: 301.306.6788

800.233.4050
www.help4adhd.org

Leonard Baylis
#100231
D.C.C. 1181 Paddock Rd.
Smyrna, DE 19977

Dear Mr. Bayliss,

Thank you for your letter. I am terribly sorry to hear that your medication has been stopped and even more disappointed to hear that the Medical Department is saying that AD/HD is not a recognized disorder. AD/HD is listed in the Diagnostic and Statistical Manual, Fourth Edition, Text Revision (DSM-IV-TR), published by the American Psychiatric Association, which classifies known disorders according to symptoms. AD/HD is also recognized as a disorder by the Federal Government and is included in the Individuals with Disabilities Education Act (IDEA) listed under Other Health Impairment (OHI), and the Social Security Administration offers SSI and SSDI to some individuals with AD/HD.

In terms of medication, although it can be very useful for many individuals, it is not the only way to treat AD/HD. Current research has shown that the most effective treatment for AD/HD in children is the multimodal treatment approach. The multimodal treatment consists of (1) parent and child education about diagnosis and treatment, (2) specific behavior management techniques, (3) medication and (4) appropriate school programming and supports. Although this treatment is not appropriate for adults or individuals who are out of school, a similar method can be. A combination of medication, individual and/or family counseling, behavior modification strategies and coaching have all been found to be helpful. I have included several articles that discuss these forms of treatment.

We often hear from adults who were diagnosed as children and received treatment, but then stopped the treatment once they reached their late teens. Unfortunately, experts once believed that children would "grow out of" their AD/HD. We now know that this is not the case. It is also common for individuals with AD/HD to also have one or more co-existing conditions. Depression is certainly one of these conditions.

I hope this and the enclosed information may be useful. Best wishes to you.

Sincerely,


Jar Lampard

**1290**

ing to deal with the special needs of the mentally ill and a lack of permanency in assignments, such that the corrections officers were unfamiliar with the inmates and their particular treatment requirements. In addition, no gates separated the unit from the general population, resulting in predation by homosexuals or assaultive individuals in A Range upon the vulnerable Special Needs Unit inmates. Finally, the dirty and dimly lit range was antithetical to a therapeutic environment.

Dr. Meacci testified that currently 130 inmates, among them 100 mentally ill, 10 to 15 mentally retarded and 10 to 15 physically disabled, would most appropriately be housed in a Special Needs Unit. He proposed several locations: 1) A Range, if it could be adequately staffed, cleaned, painted and modified to create treatment space; 2) one pod on the first level of B Block in the new building; 3) both pods on the third level of B Block; and 4) T Range in the South Block.

Dr. Metzner stated that SCIP should designate or construct an area separate from the North or South Blocks which would include adequate space for group therapy. In addition, he suggested the following minimum staffing for every 50 inmates housed in the unit: one psychiatrist for 20 hours a week; one psychologist, one psychiatric nurse, one social worker for 20 hours a week; one case manager; and one ward clerk.

Dr. Thomas stated that he opposes a Special Needs Unit if it is set up as an ill-defined hybrid unit and used as a "dumping ground" for the mentally ill. However, assuming that such a unit will be established, he recommended that the staff be chosen from among the "superb" officers currently working at SCIP. He opined that such a unit could be located in B Block but that it definitely should not be located in the North Block. Dr. Pass agreed that mentally ill inmates cannot be housed appropriately in the North Block because of inadequate supervision.

Dr. Metzner recommended that to implement an adequate mental health treatment plan, SCIP should improve the physical environment and increase the number of mental health staff. He suggested a range of programming, such as, outpatient treatment for those who can be maintained in the general population on medication and group therapy; inpatient treatment in an adequate infirmary for those experiencing acute episodes; and a protective environment, or special needs unit, for the chronically mentally ill who do not require infirmary care but who cannot survive in the general population.

In addition, Dr. Metzner suggested a centralized health care authority, located in Harrisburg, to negotiate the budget for all the state prisons. He also recommended a change in the administrative structure by adoption of one of two models: 1) one integrated medical care department; or 2) a medical department and a psychiatric department under one health care authority.

2. **Medical Services**

Plaintiffs' expert, Robert L. Cohen, M.D., Medical Director of the AIDS Program at St. Vincent's Hospital in New York City, is an internist extensively experienced in prisoner medical care. In May and June 1988, Dr. Cohen toured SCIP, reviewing medical records and interviewing prisoners and staff. Dr. Cohen noted that inmates are generally less solicitous of their own health than those in normal communities and, per capita, experience more problems related to heavy smoking, alcoholism and drug addiction. In addition, they suffer from asthma, heart disease and infectious pulmonary diseases that may be transmitted to the rest of the prison population. Plaintiffs' Exhibit 340.

a. **Staffing**

Only two physicians regularly attend to the medical needs of more than 1800 inmates at SCIP. He opined that Michael V. Gilberti, M.D., a general surgeon, works 2 hours daily for 2 hours a week in the mornings doing administrative work and seeing inmates referred to him for surgical problems. He also performs surgery on inmates at Western Pennsylvania Hospital, Pittsburgh, Pennsylvania.

Arnold Snitzer, M.D., who is Board certified in Family Practice and also maintains a

---

**1291**

private medical practice, works from 9:30 A.M. to 12:30 P.M., Monday through Friday, seeing approximately 50 inmates a day for routine medical problems. Although he never spends more than 3 hours a day on site, Dr. Snitzer will take calls daily on a 24 hour basis. Drs. Gilberti and Snitzer work only infrequently during weekends. In addition, Dr. Snitzer rounds on as many as 5 patients hospitalized at Western Pennsylvania Hospital. Each year, Dr. Snitzer takes 5 weeks of vacation or educational leave, during which time no other physician replaces him.

Thus, SCIP, an institution housing some 1800 individuals, many with serious problems, has no doctor present for 21 hours each weekday and none on weekends. Dr. Cohen opined that 8 full-time physicians are required to provide the necessary coverage. Plaintiffs' Exhibit 670.

Dr. Cohen recommended a full-time medical director and 2 full-time physicians for duty from 8 A.M. to 4 P.M. each day and physician assistants to provide coverage for the remaining 16 hours a day. Considering time off for vacations and leave, Dr. Cohen, plaintiffs' expert in prison medicine, stated that, presently, the physician staffing is insufficient to provide for the serious medical needs of prisoners.

Dr. Cohen stated that the present "dangerously inadequate" nursing staff cannot provide appropriate care for inmates, particularly because the nurses must fill the gaps in physician coverage for 21 hours a day, a task for which they are ill-suited. Plaintiffs' Exhibit 670. As a result of the overwhelming workload, stressed, tired and irritable nurses resort to calling in sick, thus further burdening the remaining staff. Plaintiffs' Exhibit 360.

Katherine Boyle, R.N., Nursing Supervisor at SCIP for eighteen years, and Michael Brewer, L.P.N., testified about the current staffing. Eight registered nurses and 6 licensed practical nurses work the following shift assignments: 6 A.M. to 2 P.M., a maximum of three R.N.s, most often two R.N.s with four L.P.N.s, and sometimes only one R.N.; 2 P.M. to 10 P.M, a maximum of three nurses, usually two R.N.s and one L.P.N. and occasionally one R.N. and two L.P.N.s; 10 P.M. to 6 A.M., one R.N., or occasionally two R.N.s and no L.P.N.s. Dr. James Wigton, Deputy Superintendent for Treatment, testified that he has unsuccessfully petitioned the Department of Corrections for three additional registered nurses.

Nurses work in 3 duty capacities: in the infirmary, in the medication room and on block duty. Block duty includes delivering medications to the blocks and the restrictive housing unit. If 4 nurses work a shift, 2 of them distribute medications. Testimony of Mr. Brewer. Overtime to cover for another nurse's vacation or leave time is sometimes voluntary, sometimes mandatory. Mr. Joseph Morrash, the Health Care Administrator, determines the amount of overtime. Nurses work overtime either from 2 to 3 times a week or from 3 to 4 times a week, totaling 24 to 40 hours every 2 weeks. Testimony of Gerry N. Wetzel, L.P.N., and Mr. Brewer.

Margaret Esposito, R.N., testified that the "quality and quantity of medical services drops to a dangerous level on the evening shift." Plaintiffs' Exhibit 358 at 6. Often only one registered nurse runs the pharmacy and handles emergencies on the blocks. The nurse is most often assisted only by 2 licensed practical nurses, one of whom remains in the second floor infirmary, observing a maximum of 29 patients, while the other remains on the blocks. She estimated that a nurse may answer as many as 7 emergency or sick calls each evening. It can require 3 or 4 minutes to reach an inmate's cell; the nurse averages 30 minutes away from the infirmary for each call.

Garnet Shoaf, R.N., testified that for 20 months, she has worked the night shift from 10 P.M. to 6 A.M. Two nights a week 2 inmate nurse's aides and a corrections officer assist her. The other nights only one inmate nurse's aide is available. The nurse's aides clean, handle supplies, observe inmates and watch intravenous infusions. She stated that she regularly cares for 20 to 28 patients, housed in the 4 wards, for serious medical illnesses and

**1302    719 FEDERAL SUPPLEMENT**

ence standard does not differ whether it is applied to pretrial detainees under the fourteenth amendment or to convicted prisoners under the eighth amendment. *Boring v. Kozakiewicz*, 833 F.2d 468, 472–73 (3d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988). Thus, our cases analyzing constitutional violations with regard to medical care for pretrial detainees are equally applicable to sentenced prisoners.

Courts have described deliberate indifference variously, but that term at least encompasses acts or omissions so dangerous in respect to health or safety that the defendant's knowledge of a large risk can be inferred. *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988).

Prison officials show deliberate indifference if they prevent an inmate from receiving recommended treatment or deny him access to medical personnel capable of evaluating his need for treatment. *Inmates*, 612 F.2d at 762.

The test enunciated in *Estelle v. Gamble* requires not only that prison authorities demonstrate deliberate indifference; the prisoner must have also suffered a serious illness or injury. *Boring*, 833 F.2d at 468. A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Laaman v. Helgemoe*, 437 F.Supp. 269, 311 (D.N.H.1977).

Officials at SCIP have violated the eighth amendment with respect to psychiatric and psychological care in at least two ways: they have failed to provide adequate staffing; they have failed to maintain an environment conducive to treatment of serious mental illness.

During the trial, plaintiffs repeatedly demonstrated that constitutional violations at SCIP are primarily traceable to staffing problems. Not only does SCIP lack a numerically sufficient staff, but the present staff is inadequately trained for its overwhelming task.

As examples of a staff insufficient to meet serious psychiatric needs, we point to the following evidence on the record. Significant delays occur between requests for psychiatric consultations and actual interviews. Inadequate record-keeping restricts treatment and follow-up care. Professionals must borrow time best devoted to providing treatment to complete purely clerical tasks. And the staggering increase in the prison population without a proportionate increment in staff encourages hasty, rather than accurate, evaluations of an inmate's mental health status, particularly as it relates to risks of violence or homosexuality.

Notwithstanding the attempts to provide excellent care by the current staff psychiatrists and psychologists, the evidence demonstrates that SCIP has not kept pace with the need to hire personnel qualified to support these professionals. For instance, none of the nurses has been trained in psychiatric nursing. Moreover, despite the recognized need and Dr. Thomas' repeated requests for psychiatric social workers, the Commonwealth has not filled these positions. We note that the corrections staff effectively reports psychiatric incidents to the psychology department once they occur, but none of these officers has been trained to prevent psychotic episodes by recognizing the signs and symptoms of an impending illness before it intensifies.

**TILLERY v. OWENS    1303**
Cite as 719 F.Supp. 1256 (W.D.Pa. 1989)

Gross staffing deficiencies establish deliberate indifference to prisoners' health needs. *Ramos*, 639 F.2d at 574. We find that the staff providing psychiatric/psychological services at SCIP is grossly deficient. Thus, we conclude that plaintiffs have established defendants' constitutional violations in this respect.

We want SCIP officials and the medical staff to have an opportunity to develop their own plan. Rather than make specific orders for staff changes or physical renovations relative to medical and psychiatric services at this time, we will direct prison officials to draft a plan or program reflecting the necessary personnel and physical changes and submit the plan to such expert consultant or consultants as may be designated by plaintiffs' counsel. The Commonwealth will pay the reasonable costs of such consultants.

Hopefully the parties will be able to reach agreement on the plan, which the Court will then review and order if the Court agrees. If the parties are unable to reach agreement, the Court will then make such orders as it deems necessary to bring SCIP into compliance with constitutional standards.

With this procedure in mind, we now make some suggestions, based on the testimony in this case, which the parties should seriously consider.

Defendants should, perhaps, hire an independent consultant to conduct a staffing study to determine the number and deployment of psychiatrists, psychologists, counselors and psychiatric nurses necessary to serve the current SCIP population. We suggest that the Commonwealth retain the services of the National Institute of Corrections for this purpose, as recommended by E. Eugene Miller.

Our visit to SCIP and plaintiffs' testimony revealed that the physical environment as it relates to psychiatric care is in shambles. Not only are the facilities malodorous, filthy dismal and crowded, but the atmosphere is oppressive and terrifying, especially to those weakened by mental illness. Dr. Metzner opined that this minimum level of care for prisoners, actually exacerbates the deterioration of those already suffering from psychiatric conditions.

We think it only makes sense that severely mentally ill inmates should be segregated from the general population. These inmates who randomly scream all night, talk loudly and laugh hysterically without apparent reason increase tension for psychologically normal inmates. In addition, such irrational behavior invites retaliation from impatient and stronger inmates. To maintain such persons in the North and South Blocks concocts a "recipe for explosion." *Cortes-Quinones*, 842 F.2d at 560.

Plaintiffs have introduced evidence that officials at SCIP have attempted, but failed, to segregate such inmates in a Special Needs Unit. Dr. Metzner testified that 70% of the states include such a unit in some of their correctional institutions. To meet constitutional requirements, SCIP, as the regional center for receiving, identifying and housing severely mentally ill inmates, should establish such a unit.

**C. Rx**

**1. Psychiatric Services**

[15] The American Medical Association ("AMA") sets three conditions that must be met for adequate psychiatric treatment at a jail: 1) a safe, sanitary, humane environment as required by sanitation, safety and health codes of the jurisdiction, 2) adequate staffing and security to inhibit suicide and assault (that is, staff within sight and sound of all mentally ill inmates), and 3) trained personnel to provide treatment

Dr. Pass recommended that SCIP provide 24-hour coverage by a psychiatrist and an additional psychologist, counselor and clerical worker. Dr. Pass has requested 10 to 15 more hours of psychological services for a total of 4 to 5 hours daily and 5 hours over the weekend. He emphasized the demand for services after 4 P.M.

We reiterate that Dr. Thomas has repeatedly requested psychiatric social worker services. He recommended that SCIP hire a chief social worker, assisted by 4 full-time social workers.

Dr. Metzner recommended that, in addition to psychiatric nurses, SCIP retain 2 additional full-time psychiatrists and 2 additional full-time psychologists.

SBI# 100231  UNIT  V
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

U.S. District Court - Delaware
Clerk Of The Court
844 N King St. Lockbox 18
Wilmington Delaware
19801-3570

